## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

|  |  |  |
|---|---|---|
| **ASHLEY WILLIAMS,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **CIVIL ACTION FILE NO.** |
| | : | **1:12-cv-04276-WSD-AJB** |
| **CAROLYN W. COLVIN,** | : | |
| ***Acting Commissioner of*** | : | |
| ***Social Security***, | : | |
| | : | |
| **Defendant.** | : | |

### UNITED STATES MAGISTRATE JUDGE'S
### FINAL REPORT AND RECOMMENDATION
### <u>IN A SOCIAL SECURITY DISABILITY ACTION</u>

Plaintiff Ashley Williams brought this action pursuant to §§ 205(g) and 1631(c) of the Social Security Act, 42 U.S.C. §§ 405(g) and 1383(c)(3), to obtain judicial review of the final decision of the Commissioner of the Social Security Administration ("the Commissioner") denying her application for supplemental security income benefits ("SSI").[1]   The action was referred to the undersigned for Report and

---

[1]     Title XVI of the Social Security Act, 42 U.S.C. § 1381, *et seq.*, provides for supplemental security income for the disabled.  Title II of the Social Security Act provides for federal disability insurance benefits ("DIB").  42 U.S.C. § 401, *et seq.* Aside from the fact that Title XVI claims are not tied to the attainment of a particular period of insurance eligibility, *Baxter v. Schweiker*, 538 F. Supp. 343, 350 (N.D. Ga. 1982), the relevant law and regulations governing the determination of disability under a claim for DIB are nearly identical to those governing the determination under a claim for SSI.  *Wind v. Barnhart*, 133 Fed. Appx. 684, 690 n.4

Recommendation ("R&R") pursuant to 28 U.S.C. § 636(b) and this Court's Local Rule 72.1. For the reasons set forth below, the undersigned **RECOMMENDS** that this matter be **REMANDED** to the Commissioner for further consideration of Plaintiff's claim.

## I.   Procedural History

Plaintiff filed an application for SSI in April 2009, alleging disability commencing on October 23, 2006. [Record (hereinafter "R") 30, 82, 84]. The application was denied initially [R82] and on reconsideration [R83]. Plaintiff then requested a hearing before an Administrative Law Judge ("ALJ") [R113-19]. An evidentiary hearing was held on January 26, 2011, [R45-80], and on April 29, 2011, the ALJ issued a "Notice of Decision-Unfavorable" in which he denied Plaintiff's claim because he found that she was not under a "disability" as defined by the Act. [R27-44]. Plaintiff then requested review by the Appeals Council. [R17-26]. The Appeals

---

(11th Cir. June 2, 2005) (citing *McDaniel v. Bowen*, 800 F.2d 1026, 1031 n.4 (11th Cir. 1986)); *see also* 42 U.S.C. § 1383(c)(3) (rendering the judicial provisions of 42 U.S.C. § 405(g) fully applicable to claims for SSI). Moreover, many times parallel statutes and regulations exist for DIB and SSI claims. Accordingly, citations in this R&R should be considered to refer to the appropriate parallel provision as context dictates. The same applies to citations of statutes or regulations found in quoted court decisions.

2

Council denied her request, making the ALJ's decision the final decision of the Commissioner. [R1-6].

Plaintiff, having exhausted all administrative remedies, filed this action on December 11, 2012. [Doc. 1]. The Commissioner filed an answer and the transcript of the administrative proceedings on May 30, 2013. [Docs. 8, 9]. The matter is now before the undersigned upon the administrative record and the parties' pleadings and briefs, and it is ripe for review pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).[2]

## II.    Plaintiff's Contentions

The issues to be decided are as follows:

1.    Whether the record evidence shows that the ALJ erred in finding that Plaintiff did not meet § 12.05(C) of the Listing of Impairments ("Listings") under the Social Security Act, 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05 (mental retardation).[3]

_____

[2]    On October 24, 2013, Plaintiff filed a motion to waive oral argument, [Doc. 16], which the undersigned granted, (*see* Dkt. Entry, Oct. 24, 2013).

[3]    On August 1, 2013, while this appeal was pending, the Social Security Administration ("SSA") amended Listing 12.05 to replace the words "mental retardation" with "intellectual disability" because of the negative connotations associated with the term "mental retardation." *See* 78 Fed. Reg. 46,499, 46,501. The change "does not affect the actual medical definition of the disorder or available programs or services." *Id*. at 46,500. While the undersigned is certainly sympathetic to the concerns underlying the amendment, this R&R uses the term "mental retardation" in order to avoid inconsistency with the terminology used in the medical records, by the parties, and by the ALJ.

3

2. Whether, lacking testimony of a vocational expert ("VE"), the ALJ could have properly determined that Plaintiff's non-exertional limitations did not significantly affect the occupational base, and whether the ALJ provided sufficient reasoning to show that he conducted the proper analysis.

[Doc. 12 at 4].

## III.  Statement of Facts

### A.  Background

Plaintiff, who was born in January 1987, was twenty-four years old at the time of the ALJ's decision.  [*See* R39-40, 285].  She has a ninth-grade education.  [R181].

### B.  Medical records

In 1999, Plaintiff received a two-day in-school suspension for fighting.  [R408]. In 2000, she received another two-day in-school suspension for cutting class and a three-day out-of-school suspension for fighting.  [R408].  In 2001, she received three days of in-school suspension for cutting class, five days of out-of-school suspension for lying to school personnel, and another three days of out-of-school suspension for arguing with school personnel.  [R408].

In March 2002, when Plaintiff was in the eighth grade, she was administered the Stanford Achievement Test Series, Ninth Edition.  [R402].  In overall Reading, Plaintiff's scaled score was equivalent to grade level 4.3.  [R402].  Her overall Mathematics scaled score was equivalent to grade level 5.4.  [R402].  In Language,

AO 72A
(Rev.8/8
2)

Plaintiff performed at a level equivalent to grade 2.8.  [R402].  In Spelling, Plaintiff performed at a level equivalent to grade 4.4.  [R402].  In Listening and Using Information, Plaintiff performed at levels equivalent to grades 2.1 and 2.9, respectively. [R402].  Plaintiff's Complete Battery score reflected performance at a 4.1 grade level. [R402].

In Spring 2002, while Plaintiff was in the eighth grade, she scored in the Level 1 category—the lowest of three levels—in reading and mathematics on a Georgia state examination.  [R405].

On October 14, 2003, Dr. Patricia S. Brawner, Ph.D., gave Plaintiff a psychological evaluation for the purposes of ruling out learning disorders and attention deficit disorder as reasons for behavior problems and inconsistent academic performance.  [R285].  Plaintiff was sixteen years old at the time.  [R285].  She had repeated the eighth grade and was repeating the ninth grade.  [R285].  Her schedule at the time included both learning-disabled classes and regular classes.  [R285].  She had a history of hemi-hypertrophy, a congenital condition where one side of the body is larger than the other.  [R285].  Plaintiff's mother reported that Plaintiff had otherwise developed normally but that within the past two years she had begun running away, fighting in school, stealing, using alcohol and marijuana, and failing academically. [R285].  Plaintiff had been evaluated by a school psychologist in 1998 and was found

5

to be of borderline intelligence. [R285-86]. The school psychologist had suggested behavioral interventions for Plaintiff's parents and teachers; the interventions were integrated at home and had "reportedly yield[ed] significant academic improvement." [R286].

Plaintiff reported difficulties with concentration, distraction, anger, compulsivity, and obsessions. [R286]. Dr. Brawner also observed that Plaintiff was unable to initiate conversation or converse easily at any time during the evaluation and appeared to be depressed and to have severely limited verbal skills. [R286].

Plaintiff completed a Wechsler Intelligence Scale for Children, receiving a Full Scale IQ score of 57, a Verbal IQ score of 63, and a Performance IQ score of 59. [R286]. Dr. Brawner noted that the scores placed Plaintiff as "significantly deficient in intellectual functioning." [R286].

Plaintiff also completed the Wide Achievement Test-3. She earned a standard score of 86 in Reading (Grade 6); a standard score of 90 in Spelling (Grade 7); and a standard score of 83 in Arithmetic (Grade 6). [R286-87]. Dr. Brawner noted that the reading score was misleading because she saw little comprehension during the testing. [R287].

AO 72A
(Rev.8/8
2)

Dr. Brawner also assessed Plaintiff's visual motor functioning via the Developmental Test of Visual-Motor Integration. [R287]. Plaintiff scored in the second percentile. [R287].

Dr. Brawner found that Plaintiff was intellectually and emotionally compromised with moderate-to-mild mental retardation. [R287]. She also noted that Plaintiff was emotionally immature. [R287]. Dr. Brawner diagnosed dysthymia[4] and mild mental retardation and assigned Plaintiff a Global Assessment of Functioning ("GAF") score of 42.[5] [R288].

On April 21, 2009, Plaintiff was admitted to the emergency room at Grady Memorial Hospital for abdominal pain and pregnancy. [R300]. She was diagnosed with anemia. [R306].

_____

[4]     Dysthymia is a mild form of depression that lingers for long periods of time, sometimes years. Those who suffer from dysthymia are usually able to function adequately, but seem consistently unhappy. WebMD, Dysthymia (Mild, Chronic Depression), http://www.webmd.com/depression/guide/chronic-depression-dysthymia (last visited 12/26/13).

[5]     The Global Assessment of Functioning ("GAF") is a numeric scale (0 through 100) that considers psychological, social, and occupational functioning on a hypothetical continuum of mental health illness. *Diagnostic and Statistical Manual of Mental Disorders* 32-34 (4th ed., Text Revision, 2000) ("DSM-IV-TR"). A GAF score between 41 and 50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *Id.* at 34.

AO 72A
(Rev.8/8
2)

On May 18, 2009, at her mother's recommendation, Plaintiff went to the Rockdale Mental Health Center for treatment. [R311]. She was easily frustrated, with low self-esteem, sadness, and irritability. [R311]. Her pregnancy was noted as a "stressor" or "extraordinary event," and she was assigned a GAF score of 52.[6] [R311-12]. She was referred for individual and group therapy. [R312].

On June 9, 2009, Plaintiff had a follow-up visit at Grady for pregnancy. [R298]. It was estimated that her pregnancy would be at full term on July 20, 2009. [R298].

Treatment records from Rockdale Mental Health Center dated June 26, 2009, show that Plaintiff was evaluated by Dr. Theresa Sapp, Ph.D. [R309]. Dr. Sapp noted that Plaintiff was pregnant and ambulated with a limp and that the left side of her body is smaller than her right side due to hemi-hypertrophy. [R309]. Dr. Sapp diagnosed her with dysthymic disorder and borderline intellectual functioning and assigned her a GAF score of 52. [R310].

On July 7, 2009, Plaintiff underwent a consultative evaluation with Dr. Frank Elliott Robinson, M.D., at the request of the SSA. [R315]. Plaintiff reported a history of congenital right hemi-hypertrophy. [R316]. She also complained of

---

[6]     A GAF score between 51 and 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV-TR at 34.

8

occasional walking difficulties due to the size discrepancy between the sides of her body and poor vision in her right eye. [R316]. She also reported occasionally dropping items from her right hand. [R316].

Dr. Robinson noted that Plaintiff was 5'2" tall, weighed 170 pounds, and was nine months pregnant. [R316-17]. The physical examination revealed that Plaintiff had facial asymmetry with flattening of the right nasolabial fold and hyperpigmentation over the right side of the face and right upper extremity. [R317]. There was an obvious size discrepancy between the sides of her face. [R317]. Plaintiff had an obvious enlargement of the right thorax as compared to the left side. [R318]. She also had bilateral leg enlargement from the knee down, with the right side being greater than the left and with trace edema of the ankles. [R318]. Dr. Robinson also noted that Plaintiff walked with a limp. [R318]. His overall assessment was that Plaintiff had a history of congenital right hemi-hypertrophy, tended to walk with a limp, and had difficulty at times holding items in her right hand. [R318]. He also stated that her neurological examination appeared normal. [R318-22].

On July 15, 2009, Plaintiff underwent a psychological evaluation with Dr. Gary Santavicca, Ph.D. [R325]. Plaintiff reported a history of special classes due to borderline intellectual functioning and stated that she had dropped out of school in the ninth grade. [R325]. She complained of mood swings, depression, loss of interest

9

due to tiredness from pregnancy, fatigue due to extra pregnancy weight, hypersomnia, and psychomotor retardation.  [R325-26].

Dr. Santavicca noted that Plaintiff's baby was due in a few days.  [R325]. Plaintiff had moved in with her mother for support and was applying for benefits in order to support herself and the baby.  [R325].  She stated that she would like to return to school and learn a trade.  [R325].  Plaintiff also indicated that she smoked cannabis frequently between the ages of eighteen and twenty-two—approximately six times per day—and had stopped because her friends refused to supply her during her pregnancy. [R326].

Dr. Santavicca noted that Plaintiff's affect appeared blunted but that her mood was appropriate.  [R326].  He also noted that Plaintiff appeared to put forth appropriate effort and that the evaluation was considered to be a valid estimate of her current behavioral and emotional functioning.  [R326].  He further observed that Plaintiff read well but lacked comprehension.  [R326].

Dr. Santavicca administered a Wechsler Adult Intelligence Scale–Third Edition ("WAIS-III").  [R326-27].  Plaintiff received a Verbal Comprehension score of 70, a Perceptual Organization score of 82, a Working Memory score of 75, a Processing Speed score of 71, and a Full Scale IQ score of 71.  [R327].

AO 72A
(Rev.8/8
2)

Dr. Santavicca also observed that Plaintiff had some difficulty responding to appropriate stimuli and mild difficulty maintaining attention to task. [R328]. He diagnosed Plaintiff with a "phase of life problem," cannabis abuse, and borderline intellectual functioning, and he assigned Plaintiff a GAF score of 48. [R330]. He also opined that given the diagnosis of borderline intellectual functioning, "it might be difficult for [Plaintiff] to support herself and her child without assistance." [R330].

On July 21, 2009, Plaintiff had an emergency cesarian section and delivered a full-term baby. [R364-66]. She was discharged from the hospital on July 24, 2009. [R360].

On August 25, 2009, file-reviewing physician Dr. Judith Piat, Ph.D., completed a Psychiatric Review Technique ("PRT") at the request of the SSA. [R336-49]. Dr. Piat found that Plaintiff had borderline intellectual functioning and moderate difficulties in maintaining concentration, persistence, or pace. [R337, 346]. She also found that Plaintiff's mental disorder caused more than a minimal limitation of ability to do any basic work activity. [R347].

The same day, Dr. Piat completed a Mental Residual Functional Capacity ("MRFC") Assessment. [R332-35]. Dr. Piat found that Plaintiff was moderately limited in the ability to understand and remember detailed instructions; the ability to carry out detailed instructions; the ability to maintain attention and concentration for

11

extended periods; the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms; and the ability to perform at a consistent pace without an unreasonable number and length of rest periods.  [R332-33]. She further opined that Plaintiff's pace was somewhat slow, that her persistence varied, and that she could understand and carry out two- and three-step directions, could concentrate for brief (two-hour) periods, could adhere to workplace norms and rules, and was not substantially limited.  [R334].  She also stated that Plaintiff's social skills were adequate for simple situations and that her adaptive skills appeared to be intact. [R334].

On September 24, 2009, and again on October 15, 2009, Plaintiff presented at Grady with complaints of right-leg pain.  [R352, 354].  It was noted that she had a history of hemi-hypertrophy, right leg pain, and back pain.  [R354].  An x-ray of the lumbar spine from September 24, 2009, revealed mild scoliosis of the lumbar spine. [R369].  An x-ray of the pelvis from the same day noted a pelvic tilt.  [R370].  An MRI of the thoracic and lumbar spine from October 5, 2009, revealed a prominent kyphotic deformity of the cervical spine at the C4 to C5 level,[7] abnormal signal within the

_____

[7]       Kyphosis is a deformity of the spine that is characterized by extensive bending.  *PDR Med. Dictionary* 925 (1st ed. 1995).

12

interspinous ligaments of the upper thoracic spine, and a heterogeneously enlarged uterus. [R371].

On May 11, 2010, file-reviewing physician Dr. Allen Carter, Ph.D., completed a PRT at the request of the SSA. [R383-96]. Dr. Carter found that Plaintiff had borderline intellectual functioning and moderate difficulties in maintaining concentration, persistence, or pace. [R384, 393]. He also found that Plaintiff's mental disorder caused more than a minimal limitation of ability to do any basic work activity. [R394].

The same day, Dr. Carter completed an MRFC Assessment. [R379-82]. Dr. Carter found that Plaintiff was moderately limited in the ability to understand and remember detailed instructions; the ability to carry out detailed instructions; the ability to maintain attention and concentration for extended periods; the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms; and the ability to perform at a consistent pace without an unreasonable number and length of rest periods. [R379-80]. He further opined that Plaintiff's pace was slow, that her persistence varied, and that she could understand and carry out two- and three-step directions, could concentrate for brief (two-hour) periods, could adhere to workplace norms and rules, and was not substantially limited. [R381].

13

Dr. Carter also stated that Plaintiff's social skills were adequate for simple situations and that her adaptive skills appeared to be intact. [R381].

On August 20, 2010, Plaintiff again reported to Grady with right-leg pain. [R433]. Examination showed that the right side of her body was bigger than the left side. [R433]. She was diagnosed with chronic episodic right lower extremity pain. [R434]. Because the pain bothered Plaintiff only occasionally, she was advised to continue to take Tylenol as needed so long as the pain did not progress. [R434]. In light of her history of hemi-hypertrophy, she was also advised to see her primary care provider periodically for routine evaluation. [R434].

## C.     Administrative Documents

In an Adult Function Report dated February 13, 2010, Plaintiff and her mother reported that on a typical day, Plaintiff would get up at about 5:30 a.m., feed her baby, and then go back to bed. [R227]. At about 8:00 a.m., she would get up again to bathe, dress, and feed the baby, and prepare breakfast. [R227]. At about 11:30 a.m., when the baby would nap, Plaintiff would do household chores and prepare formula. [R227]. At about 1:30 p.m., she would feed the baby and have bonding time, eat lunch, and handle any business matters. [R227]. From 4:00 p.m. to 6:00 p.m., while the baby napped, Plaintiff would watch television or listen to music, spend time with her mother, and help with dinner. [R227]. From 6:00 p.m. to 9:00 p.m., Plaintiff would take care

14

of the baby's needs, bathe herself and the baby, feed them both, and play with and talk to the baby. [R227]. At 9:00 p.m., both she and the baby would go to bed. [R227].

Plaintiff reported that she takes care of all of her daughter's basic needs, including feeding, bathing, and dressing. [R228]. She also stated that her mother helped financially, would babysit, and assisted with the baby's care. [R228]. She indicated that she had no problems with her own personal care and would have sleep problems only when she had back or leg pain. [R228]. Her mother would sometimes help her make sure she was properly groomed. [R229].

Plaintiff's mother did the cooking. [R229]. Plaintiff would prepare meals maybe twice a week, and those would be limited to microwave items and sandwiches. [R229]. She would clean her room daily, make her bed, and wash clothes and dishes, but she needed her mother's help and encouragement. [R229].

Plaintiff went out about two days a week. [R230]. She would walk or ride in a car but did not drive because she did not own a car. [R230]. She would shop for groceries and personal items approximately twice a month for twenty to thirty minutes at a time. [R230]. She stated that she could pay bills and count change. [R230]. She reported that she spends time with family, talking, watching television, and having dinner out. [R231]. She would also talk on the phone with friends, watch television, and listen to music every day. [R231]. She did not need to be reminded to go places

15

and only needed someone to go with her if the outing involved a lot of details and information. [R231].

Plaintiff reported that she sometimes became easily irritated and frustrated, which made it difficult to get along with others. [R232-33]. She stated that because of the hemi-hypertrophy she could only stand and walk for short periods of time before feeling pain in her legs, ankles, and feet. [R232]. She also stated that she had trouble getting things done at a certain pace and sometimes needed more instruction than other people. [R232-33]. She reported having been told that she has a short attention span but that she does well with short, clear, spoken instructions. [R232].

### D.    Evidentiary hearing before the ALJ

At the hearing held before the ALJ on January 26, 2011, [R45], Plaintiff testified that she was last employed in 2009 as a janitor, [R53]. She had been working at a fast food restaurant as a cashier, but she had difficulties with learning the codes required, and the company then moved her to the janitor position. [R53-54]. She was unable to perform the janitorial job because she had difficulties with standing up for long periods. [R54]. Her legs hurt after standing for one to two hours, and sometimes she needed to sit for an hour before she could get back up. [R54]. She could sit for around an hour before her legs and lower back hurt. [R55].

16

Plaintiff stated that she also had right leg pain.  [R66].  This pain occurred primarily when she was engaged in activities, [R67], but about three days per month, her right leg was painful when she was not engaged in any activity, [R68].  She also had pain and swelling in her right foot.  [R71-72].

Plaintiff reported that she had lived with her parents for the past three years and that she had a baby.  [R56].  She was responsible for cleaning her bedroom, the bathroom, and the kitchen.  [R57].  She had passed both the written and road-skills portions of the driver's test and held a driver's license.  [R57].

Plaintiff indicated that she had aching and numbness in her right hand for around four hours each day.  [R58-61].  The numbness caused difficulties with writing or holding objects.  [R60].  Plaintiff would try to get relief by rubbing her wrist with rubbing alcohol, but it only rarely worked.  [R61].  Her right hand became swollen for about thirty minutes at a time, three to five days each week.  [R63].

Plaintiff stated that she did not take medication for her pain because she did not have the finances to pay for medications and because they did not work.  [R70].  Plaintiff also testified to having depression and crying spells but stated that she was not receiving treatment because she had not been diagnosed with anything and because her Medicaid was changing and she had not yet looked for another counselor.  [R73-74].

17

**IV.   ALJ's Findings**

The ALJ made the following findings of fact and conclusions of law:

1.   The claimant has not engaged in substantial gainful activity since April 21, 2009, the application date (20 CFR 416.971 *et seq*.).

. . .

2.   The claimant has the following severe impairments: Hemihypertrophy, dysthymic disorder, and borderline intellectual functioning (20 CFR 416.920(c)).

. . .

3.   The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

. . .

4.   After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b).   She is unable to perform work involving detailed or complex instructions.

. . .

5.   The claimant has no past relevant work (20 CFR 416.965).

6.   The claimant was born on January 26, 1987 and was 22 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963).

18

7. The claimant has a limited education and is able to communicate in English (20 CFR 416.964).

8. Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

9. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

. . .

10. The claimant has not been under a disability, as defined in the Social Security Act, since April 21, 2009, the date the application was filed (20 CFR 416.920(g)).

[R32-40].

## V.    Standard for Determining Disability

An individual is considered disabled for purposes of disability benefits if she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). The impairment or impairments must result from anatomical, psychological, or physiological abnormalities which are demonstrable by medically accepted clinical or laboratory diagnostic techniques and must be of such severity that the claimant is not only unable to do

previous work but cannot, considering age, education, and work experience, engage in any other kind of substantial gainful work that exists in the national economy. 42 U.S.C. §§ 423(d)(2)-(3), 1382c(a)(3)(B), (D).

The burden of proof in a Social Security disability case is divided between the claimant and the Commissioner. The claimant bears the primary burden of establishing the existence of a "disability" and therefore entitlement to disability benefits. *See* 20 C.F.R. §§ 404.1512(a), 416.912(a). The Commissioner uses a five-step sequential process to determine whether the claimant has met the burden of proving disability. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a); *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001); *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999). The claimant must prove at step one that she is not undertaking substantial gainful activity. *See* 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). At step two, the claimant must prove that she is suffering from a severe impairment or combination of impairments that significantly limits her ability to perform basic work-related activities. *See* 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). At step three, if the impairment meets one of the listed impairments in Appendix 1 to Subpart P of Part 404 (Listing of Impairments), the claimant will be considered disabled without consideration of age, education, and work experience. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). At step four, if the claimant

20

is unable to prove the existence of a listed impairment, she must prove that her impairment prevents performance of past relevant work. *See* 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). At step five, the regulations direct the Commissioner to consider the claimant's residual functional capacity, age, education, and past work experience to determine whether the claimant can perform other work besides past relevant work. *See* 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). The Commissioner must produce evidence that there is other work available in the national economy that the claimant has the capacity to perform. *Doughty*, 245 F.3d at 1278 n.2. To be considered disabled, the claimant must prove an inability to perform the jobs that the Commissioner lists. *Id.*

If at any step in the sequence a claimant can be found disabled or not disabled, the sequential evaluation ceases and further inquiry ends. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). Despite the shifting of burdens at step five, the overall burden rests on the claimant to prove that she is unable to engage in any substantial gainful activity that exists in the national economy. *Doughty*, 245 F.3d at 1278 n.2; *Boyd v. Heckler*, 704 F.2d 1207, 1209 (11th Cir. 1983), *superceded by statute on other grounds by* 42 U.S.C. § 423(d)(5), *as recognized in Elam v. R.R. Ret. Bd.*, 921 F.2d 1210, 1214 (11th Cir. 1991).

AO 72A
(Rev.8/8
2)

## VI.    Scope of Judicial Review

A limited scope of judicial review applies to a denial of Social Security benefits by the Commissioner.  Judicial review of the administrative decision addresses three questions:  (1) whether the proper legal standards were applied; (2) whether there was substantial evidence to support the findings of fact; and (3) whether the findings of fact resolved the crucial issues.  *Fields v. Harris*, 498 F. Supp. 478, 488 (N.D. Ga. 1980).  This Court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner.  *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005).  If substantial evidence supports the Commissioner's factual findings and the Commissioner applies the proper legal standards, the Commissioner's findings are conclusive.  *Lewis v. Callahan*, 125 F.3d1436, 1439-40 (11th Cir. 1997); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987) (per curiam); *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986)  (per curiam); *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983).

"Substantial evidence" means "more than a scintilla, but less than a preponderance."  *Bloodsworth*, 703 F.2d at 1239.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion and it must be enough to justify a refusal to direct a verdict were the case before a jury.  *Richardson*

22

*v. Perales*, 402 U.S. 389, 401 (1971); *Hillsman*, 804 F.2d at 1180; *Bloodsworth*, 703 F.2d at 1239. "In determining whether substantial evidence exists, [the Court] must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [Commissioner's] decision." *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986) (per curiam). Even where there is substantial evidence to the contrary of the ALJ's findings, the ALJ decision will not be overturned where "there is substantially supportive evidence" of the ALJ's decision. *Barron v. Sullivan*, 924 F.2d 227, 230 (11th Cir. 1991). In contrast, review of the ALJ's application of legal principles is plenary. *Foote v. Chater*, 67 F.3d 1553, 1558 (11th Cir. 1995); *Walker*, 826 F.2d at 999.

## VII. Claims of Error

Plaintiff argues that the ALJ erroneously relied on Dr. Santavicca's diagnosis of borderline intellectual functioning, [R34, 38], and that, according to the evidence of record, Plaintiff in fact meets Listing 12.05(C) (mental retardation). [Doc. 12 at 16-17]. Plaintiff also contends that the ALJ's decision is not based on substantial evidence because the ALJ failed to consult a VE before determining that Plaintiff's non-exertional limitations do not significantly affect the occupational base. [*Id*. at 18-24]. The undersigned addresses each argument in turn.

23

## A.      Listing 12.05(C)

The Listing of Impairments in Appendix 1 of Subpart P describes for each of the major body systems impairments that are considered to be severe enough to render an individual disabled.  20 C.F.R. § 404.1525(a).  As noted above, at the third step of the five-step disability evaluation process, the ALJ must determine whether a claimant's impairments meet or equal one of the Listings and meet the duration requirement.[8] 20 C.F.R. § 404.1520(a)(4)(iii).  If a claimant meets or equals a Listing, then she is disabled.  *Id.*

A claimant meets a Listing if she has a diagnosis included in the Listings and provides medical reports documenting that her conditions meet the specific criteria in the Listings.  *Wilson v. Barnhart*, 284 F.3d 1219, 1224 (11th Cir. 2002) (per curiam) (citing 20 C.F.R. § 404.1525(a)-(d)).  A claimant equals a Listing if the medical findings equal in severity and duration the listed findings.  *Wilson*, 284 F.3d at 1224. The claimant bears the burden of showing that her impairment meets a Listing.  *Wilbon v. Comm'r of Soc. Sec.*, 181 Fed. Appx. 826, 828 (11th Cir. May 18, 2006) (per curiam) (citing *Wilkinson v. Bowen*, 847 F.2d 660, 662 (11th Cir. 1987) (per curiam)).

------

[8]      An impairment "must have lasted or must be expected to last for a continuous period of at least 12 months" to meet the duration requirement. *See* 20 C.F.R. § 404.1509.

AO 72A
(Rev.8/8
2)

### 1.    Arguments

Plaintiff refers to the text of Listing 12.05(C), which states,

> 12.05 [Mental retardation]:  [Mental retardation] refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22. The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
>
> . . .
>
> C.    A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function[.]

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05.

Plaintiff raises two primary arguments in support of her contention that substantial evidence does not support the ALJ's determination that Plaintiff does not meet Listing 12.05(C).  [Doc. 12 at 16-17].  First, Plaintiff argues that the ALJ's determination that she did not meet Listing 12.05(C) rests entirely on the lack of a mental-retardation diagnosis, [*id*. at 16-17 [citing R34, 38]], and she contends that this was error because Listing 12.05(C) does not in fact require a claimant to have been diagnosed with mental retardation, [*id*. at 17 (citing Listing 12.05 and *Taylor v. Apfel*, No. Civ. A. 00-0486-BH-M, 2001 WL 228065, at *2-3 (S.D. Ala. Feb. 7, 2001))].

25

Second, Plaintiff argues that the evidence shows that she does meet Listing 12.05(C). [Doc. 12 at 16-18]. Specifically, she contends that the findings from the psychological evaluation Dr. Santavicca gave her on July 15, 2009, establish that she is in the impaired range of intellectual functioning and has deficits in adaptive functioning: her Verbal IQ score was 70, [R327]; her Processing IQ score was 71, [R237]; her Full Scale IQ score was 71, [R327]; Dr. Santavicca diagnosed her with Borderline Intellectual Functioning and assigned her a GAF of 48, [R330]; and Dr. Santavicca opined that it might be difficult for her to support herself and her child without assistance, [R330]. [Doc. 12 at 16, 18]. Plaintiff further contends that the ALJ's determination that her hemi-hypertrophy, dysthymic disorder, and borderline intellectual functioning produced "more than minimal functional limitations for performing basic work activities," [R32], satisfies the requirement in 12.05(C) that the claimant have a "physical or other mental impairment imposing an additional and significant work-related limitation of function." [Doc. 12 at 18 n.9].[9]

_____

[9]     The undersigned also notes that Plaintiff argues that the ALJ—who is not a doctor or medical expert—was not qualified to make the determination that borderline intellectual functioning "does not preclude an ability to perform unskilled work." [Doc. 12 at 17-18 [referring to R38]]. It is unclear what point Plaintiff seeks to make with this argument; she does not explain how the argument relates to her contention that she meets Listing 12.05(C), nor does she support the argument with a citation to legal authority. [See Doc. 12 at 17-18]. Therefore, whatever the issue might be, it is not properly before the Court. See Outlaw v. Barnhart, 197 Fed. Appx. 825, 827 n.3

AO 72A
(Rev.8/8
2)

The Commissioner, in response, first argues that Plaintiff has failed to point to any specific evidence or explain how the evidence shows deficits in adaptive functioning as required by the diagnostic description of mental retardation. [Doc. 13 at 7 (citing *Crayton v. Callahan*, 120 F.3d 1217, 1219 (11th Cir. 1997) ("To be considered for disability benefits under section 12.05, a claimant must at least (1) have significantly subaverage general intellectual functioning; (2) have deficits in adaptive behavior; and (3) have manifested deficits in adaptive behavior before age 22."))]. Second, the Commissioner contends that Plaintiff has ignored Eleventh Circuit case law finding that the absence of a diagnosis of mental retardation may be a proper basis for finding that Listing 12.05(C) has not been met. [Doc. 13 at 8 (citing *Jordan v. Comm'r of Soc. Sec. Admin.*, 470 Fed. Appx. 766, 767 (11th Cir. Apr. 20, 2012) (per curiam); *Harris v. Comm'r of Soc. Sec.*, 330 Fed. Appx. 813, 815 (11th Cir. May 22, 2009) (per curiam))]. Third, the Commissioner argues that the ALJ properly considered the relevant evidence and that the overall record provides substantial evidence for his finding that Plaintiff's impairments did not meet Listing 12.05(C). [Doc. 13 at 8-12 (noting the ALJ's consideration of the evaluations made by

_____

(11th Cir. Aug. 10, 2006) (per curiam) (finding that the plaintiff waived an issue by failing to elaborate on the argument or provide a citation to authority regarding the argument).

AO 72A
(Rev.8/8
2)

Dr. Santavicca and Dr. Sapp, [R34-35, 309-10, 325-30], and arguing that the evaluations made by Dr. Piat and Dr. Carter, [R332-50, 379-96], are further substantial evidence supporting the ALJ's finding regarding Listing 12.05(C), and that Plaintiff's reports regarding her activities of daily living and her possession of a driver's license, [R57, 227-29], are substantial evidence that she did not have deficits in adaptive functioning)].

In reply, Plaintiff reiterates that Listing 12.05(C) does not require a claimant to have been diagnosed with mental retardation. [Doc. 14 at 1-2]. She also contends that the Commissioner does not dispute that Plaintiff has significantly subaverage general intellectual functioning. [*Id*. at 2]. She then argues that the Commissioner appears to read Listing 12.05 to require *significant* deficits in adaptive functioning rather than simply the "deficits" set out in the text of the Listing, and she argues that according to the DSM-IV, she does have deficits in adaptive functioning.[10] [*Id*. at 3-4]. Specifically,

---

[10]    The DSM-IV's diagnostic criteria for mental retardation is as follows:

A.    Significantly subaverage intellectual functioning: an IQ of approximately 70 or below on an individually administered IQ test . . . .

B.    Concurrent deficits or impairments in present adaptive functioning (i.e., the person's effectiveness in meeting the standards expected for his or her age by his or her cultural group) in at least two of the following areas: communication, self-care, home living,

28

she contends that the record evidence shows that she has deficits or impairments in the areas of functional academic skills, functional academic resources, communication, home living, social interpersonal skills, and self-direction.   [*Id.* at 4 (citing Dr. Brawner's psychological evaluation, [R285-86], and Plaintiff's disciplinary records, [R408])].

### 2.    Discussion

The undersigned first notes that the Commissioner has given the Court no support for a determination that the lack of a mental-retardation diagnosis is alone sufficient grounds for affirming the ALJ's decision.  [*See* Doc. 13 at 8 (citing *Jordan*, 470 Fed. Appx. at 767; *Harris*, 330 Fed. Appx. at 815)].  It is true that in both *Jordan* and *Harris*, the claimants were diagnosed with borderline intellectual functioning and the ALJs listed the lack of a diagnosis of mental retardation among the reasons for finding that the claimant did not meet Listing 12.05(C).  *See Jordan*, 470 Fed. Appx. at 768-69; *Harris*, 330 Fed. Appx. at 815.  In both cases, however, the ALJ also listed

------

social/interpersonal skills, use of community resources, self-direction, functional academic resources, self direction, functional academic skills, work, leisure, health, and safety.

C.    The onset is before age 18 years.

DSM-IV at 49.

additional reasons for finding that the claimant did not meet the Listing.  In *Jordan*, in addition to the diagnosis of borderline intellectual functioning (as distinct from mental retardation), the ALJ's decision that the plaintiff did not meet the Listing also was supported by evidence that the plaintiff had completed eleventh grade without repeating a grade, had taken mostly "general education classes," had ranked in the top one-third of her high-school class, and was able to read, write, and perform basic math, albeit with some difficulty with division.  *Jordan*, 470 Fed. Appx. at 768-69.  Similarly, in *Harris*, in addition to noting that the plaintiff had been diagnosed with borderline intellectual functioning and not mental retardation, the ALJ also supported his conclusion that the plaintiff did not meet Listing 12.05(C) with evidence that the plaintiff did not have "the type of deficit in adaptive functioning required for mental retardation":  he could dress and bathe himself, take care of his personal needs, manage money, read, communicate effectively, and do simple math.  *Harris*, 330 Fed. Appx. at 815.  Thus, neither *Jordan* nor *Harris* provide legal grounds upon which this Court might conclude that the lack of a diagnosis of mental retardation was alone sufficient to support the ALJ's finding that Plaintiff did not meet Listing 12.05(C).

Indeed, despite the oft-quoted language in *Wilson* suggesting that a diagnosis of the listed condition is a prerequisite to meeting a Listing, the undersigned has been unable to locate any cases in which a court has rejected a claim solely on the grounds

30

that the plaintiff lacked such a diagnosis.  *See Wilson*, 284 F.3d at 1224 ("To 'meet' a Listing, a claimant must have a diagnosis included in the Listings and must provide medical reports documenting that the conditions meet the specific criteria in the Listings . . . .") (citing 20 C.F.R. § 404.1525(a)-(d))).  Additionally, the rules cited in support of the portion of *Wilson* stating that a diagnosis is required do not themselves state that a medical diagnosis of the listed condition is a prerequisite to meeting the Listing.  *See* 20 C.F.R. § 404.1525(a)-(d).  Thus, had the ALJ summarily rejected Plaintiff's claim that she meets the Listing for mental retardation based only on Dr. Santavicca's and Dr. Sapp's diagnoses of borderline intellectual functioning, his opinion may not have been supported by substantial evidence.

The Court need not decide this legal issue, however, because Plaintiff mischaracterizes the ALJ's reasoning for his determination that Plaintiff does not meet the criteria for Listing 12.05(C).  [*See* Doc. 12 at 17].  The ALJ did not rest his conclusion simply on Dr. Santavicca's and Dr. Sapp's diagnoses of borderline intellectual functioning, but he also considered and discussed the evidence relevant to determining Plaintiff's level of adaptive functioning, [*see* R33-34, 37-38], and found that "her level of adaptive functioning is not consistent with that of mild mental retardation," [R34].  The undersigned finds that, in doing so, the ALJ properly applied

31

the law in determining that Plaintiff's impairments do not meet Listing 12.05(C), and further finds that the ALJ supported his conclusion with substantial evidence.

In the section of the opinion specifically focusing on Listing 12.05(C), the ALJ did expressly note that Dr. Santavicca's evaluation resulted in a diagnosis of borderline intellectual functioning rather than mental retardation, and that Dr. Sapp had reached the same diagnosis. [R34-35]. Additionally, the ALJ observed that Dr. Santavicca had "specifically noted that [Plaintiff's] depression symptoms were subthreshold" and that her pregnancy, which was nearing full term at the time of Dr. Santavicca's evaluation, "might have confounded several of her endorsed symptoms." [R34 [citing R329]].

Other portions of the ALJ's opinion contain numerous additional findings relevant to Plaintiff's limitations in adaptive functioning. [R33, 36]. Specifically, in evaluating the restrictions and difficulties attendant to Listing 12.05(D) and in determining Plaintiff's residual functional capacity ("RFC"), the ALJ found that Plaintiff was only mildly restricted in her activities of daily living, such as attending to personal grooming and performing household chores, as evidenced by her testimony that she cleans the bathroom, bedroom, and kitchen, cares for her baby, passed both the written and road skills portions of the driver's exam and possesses a driver's license, and can use public transportation; that Plaintiff had mild difficulties in social functioning, as she did not state that she had problems getting along with coworkers or

32

supervisors, and she lives with and frequently communicates with her mother, stepfather, and baby; that Plaintiff had moderate difficulties with concentration, persistence or pace, based on evidence that she did not attend school after the ninth grade, she had difficulties "catching on" to some of the duties required when she tried to work as a cashier, and the dysthymic disorder limited her concentration and focus; that Plaintiff had experienced no episodes of decompensation of an extended duration, received only limited mental health treatment, refused treatment for substance abuse, and was referred only for sessions to bolster her self-esteem and confidence; and that Plaintiff has the ability to perform the full range of movement associated with light exertional-level work, given the lack of any physical symptoms beyond her hemi-hypertrophy, lack of any prescribed treatment beyond direction to take Tylenol as needed, and Plaintiff's testimony that she takes no medication for pain. [R33, 37-38 [citing R308-14, 323-31, 398-413]].

The ALJ also acknowledged the diagnoses and observations Dr. Brawner included in her 2003 consultative evaluation, including the diagnosis of mental retardation and the observations suggesting that Plaintiff's adaptive functioning was limited, and he properly explained why he did not credit them, [R34, 37-38]. *See McSwain v. Bowen*, 814 F.2d 617, 619 (11th Cir. 1987) (per curiam) (providing that the opinion of a one-time examiner is not entitled to deference). The ALJ explained that

33

he did not credit Dr. Brawner's diagnosis of mental retardation or her conclusions about Plaintiff's potential need for supervision, guidance, and assistance in her adult years because the IQ scores found in 2009—the time period shortly after Plaintiff applied for benefits—were so much higher than those found in 2003 and because Plaintiff had reported at the time of the 2003 testing session that she was engaging in the use of illegal drugs and alcohol and had been using those substances for the past two years. [R34, 37-38]. The ALJ further explained that he found Plaintiff's 2003 report of her level of adaptive functioning inconsistent with that of mild retardation in that she was reading at a sixth-grade level and was capable of passing the written portion of the driver's license examination. [R34 [citing R285-93]].

Additionally, the ALJ acknowledged evidence contrary to his conclusion that Plaintiff's adaptive functioning was not sufficiently deficient to meet Listing 12.05(C). In particular, he expressly noted that Plaintiff lived with her mother and stepfather; she does not cook; she reported continuously getting into trouble at school and had academic difficulties; she had three years ago lived with an aunt and prior to that lived "in the street" because of her troubles; her depression causes her to become grumpy and want to stay to herself; and that she could not make change. [*See* R36].

For all of these reasons, the undersigned finds that the ALJ properly considered the evidentiary record and that substantial evidence supports the ALJ's determination

34

AO 72A
(Rev.8/8
2)

that Plaintiff's impairments do not meet Listing 12.05(C).   Thus, even though Plaintiff—and even the Court—might have decided the facts or weighed the evidence differently, the ALJ's decision should be affirmed.   *See Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990) ("Even if the evidence preponderates against the Secretary's factual findings, we must affirm if the decision reached is supported by substantial evidence.").   The undersigned therefore **RECOMMENDS** that the District Judge **AFFIRM** the ALJ's determination that Plaintiff did not meet Listing 12.05(C).

### B.    VE Testimony

Because the ALJ found that Plaintiff had a severe combination of impairments that did not satisfy a Listing and that she had no past relevant work experience, "the Commissioner bore the burden to 'show the existence of other jobs in the national economy which, given [Plaintiff's] impairments, she can perform.' "   *Jordan*, 470 Fed. Appx. at 769-70 (quoting *Jones v. Apfel*, 190 F.3d 1224, 1228-29 (11th Cir. 1999)). Here, the ALJ found that Plaintiff had the residual functional capacity to perform light exertional work and that her non-exertional limitations had "little to no effect on the occupational base of unskilled light work." [R39-40].  He then relied on the Medical-Vocational Rules ("grids"), *see* 20 C.F.R. Pt. 404, Subpt. P, App. 2 § 200.00(e), specifically on Medical-Vocational Rule 202.17, to find that there

was a significant number of jobs in the national economy that Plaintiff could perform, [R39-40].

### 1.    Arguments

Plaintiff argues that the ALJ erred at step five when he determined, without consulting a VE, that there is a significant number of jobs in the national economy that Plaintiff can perform. [Doc. 12 at 18-23]. She relies primarily on *Phillips v. Barnhart*, 357 F.3d 1232, 1243 (11th Cir. 2004), and *Allen v. Sullivan*, 880 F.2d 1200, 1201 (11th Cir. 1989), which she contends establish that an ALJ must consult with a VE in any case in which the claimant has non-exertional impairments. [Doc. 12 at 19-21 (also citing *Wilson*, 284 F.3d at 1227; *Wolfe v. Chater*, 86 F.3d 1072, 1077-78 (11th Cir. 1996); *Marbury v. Sullivan*, 957 F.2d 837, 839 (11th Cir. 1992))], and she argues that her borderline intellectual functioning, dysthymic disorder, and Full Scale IQ score of 71 indicate significant nonexertional impairments that needed to be considered by a VE, [Doc. 12 at 22]. Plaintiff also contends that the ALJ did not provide sufficient reasoning or articulate substantial evidence showing that he conducted the proper step-five analysis. [*Id.* at 22-24 (citing *Allen*, 880 F.2d at 1201; *Wilson*, 284 F.3d at 1227; *Williams v. Massanari*, No. CA 00-0787-BH-C, 2001 WL 530458, at *3 (S.D. Ala. May 10, 2001), and several cases from outside the Eleventh Circuit)].

In response, the Commissioner first asserts that Plaintiff did not challenge the ALJ's finding that Plaintiff had the RFC to perform light work that entails no detailed or complex instructions. [Doc. 13 at 12 [citing R35]]. The Commissioner then argues that the ALJ reasonably explained that the limitation of no work involving detailed or complex instructions does not significantly erode the job base under grid rule 202.17 because the limitation was not inconsistent with the unskilled job base contemplated by the rule, [Doc. 13 at 13 [citing R40]], and that it would have been inappropriate to have a VE consider the IQ score or any other medical evidence because it is the ALJ's job to determine the claimant's functional limitations, [Doc. 13 at 13-14 (citing *Jones*, 190 F.3d at 1229)]. The Commissioner then contends that *Allen* involved additional non-exertional limitations (stress avoidance) and is therefore factually distinguishable and that in a more recent case, the Eleventh Circuit rejected a claimant's argument that borderline intellectual functioning constituted a significant nonexertional limitation requiring VE testimony. [Doc. 13 at 14-15 (*comparing Allen*, 880 F.2d at 1201 *with Jordan*, 470 Fed. Appx. at 770)].

Plaintiff did not argue the issue in her reply brief and instead states that she rests on the argument set forth in her memorandum of law. [Doc. 14 at 5].

37

### 2.    Discussion

The grids are predicated on an individual having an impairment that manifests itself by limitations in the strength requirements of a job.  20 C.F.R. Pt. 404, Subpt. P, App. 2 § 200.00(e).  The Eleventh Circuit has described the grids as follows:

> The grids are a series of matrices which correlate a set of variables—the claimant's residual functional capacity (*i.e.*, the ability, despite impairments, to do sedentary, light, etc. work), age, educational background, and previous work experience.  Upon the entry of a set of these variables into the appropriate matrix a finding of disabled or not disabled is rendered.

*Gibson v. Heckler*, 762 F.2d 1516, 1520 (11th Cir. 1985).  All of the jobs listed in the grids are "unskilled, meaning that they require 'little or no judgment' in the performance of 'simple duties that can be learned on the job in a short period of time.' " *Jordan*, 470 Fed. Appx. at 770 (quoting 20 C.F.R. § 416.968(a) (defining "unskilled work") and citing 20 C.F.R. Pt. 404, Subpt. P, App. 2 § 200.00(b) (stating that the jobs in the grids are unskilled)).

The Commissioner is directed to apply the grids when a claimant: (1) is not performing substantial gainful employment; (2) has a severe medically determinable impairment that prevents the claimant from performing past relevant work; and (3) the findings of fact concerning the claimant's vocational factors and RFC is the same as the corresponding criterion of a grid.  20 C.F.R. § 404.1569; 20 C.F.R. Pt. 404 Subpt. P,

App. 2 § 200.00(a).  However, in some cases in which the claimant has both exertional limitations[11] and nonexertional limitations,[12] the grids do not always apply.  *Sryock v. Heckler*, 764 F.2d 834, 836 (11th Cir. 1985) (per curiam).  " '[N]on-exertional limitations can cause the grid to be inapplicable only when the limitations are severe enough to prevent a wide range of gainful employment at the designated level.' "  *Id.* (quoting *Murray v. Heckler*, 737 F.2d 934, 935 (11th Cir. 1984)); *see also Francis v. Heckler*, 749 F.2d 1562, 1566-67 (11th Cir. 1985) ("Exclusive reliance on the grids is not appropriate either when [a] claimant is unable to perform a full range of work at a given functional level or when a claimant has non-exertional impairments that

---

[11]     "Exertional limitations affect an individual's ability to meet the seven strength demands of the job: sitting, standing, walking, lifting, carrying, pushing, and pulling."  *Phillips*, 357 F.3d at 1242 n.11 (citing Social Security Ruling ("SSR") 96-4p); *see also* 20 C.F.R. § 404.1569a(a)).

[12]     "Nonexertional limitations or restrictions affect an individual's ability to meet the other demands of jobs [(other than the strength demands)] and include mental limitations, pain limitations, and all physical limitations that are not included in the seven strength demands."  *Phillips*, 357 F.3d at 1242 n.11 (citing SSR 96-4p); 20 C.F.R. § 404.1569a(c) (providing the following examples of nonexertional limitations: difficulty functioning because of nervousness, anxiety, or depression; difficulty maintaining concentration or attention; difficulty understanding or remembering detailed instructions; difficulty seeing or hearing; difficulty tolerating some physical features of certain work setting, such as dust or fumes; difficulty performing the manipulative or postural functions of some work, such as reaching, handling, stooping, climbing, crawling, or crouching).

39

significantly limit basic work skills.").  In cases where the non-exertional limitations are sufficiently severe, the ALJ should not exclusively rely on the grids but must also solicit a VE's testimony before determining whether the claimant can perform any jobs in the national economy.  *Wolfe*, 86 F.3d at 1077-78.

Thus, where both exertional and non-exertional limitations affect the claimant's ability to work, the ALJ must " 'make a specific finding as to whether the nonexertional limitations are severe enough to preclude a wide range of employment at the given work capacity level indicated by the exertional limitations.' "  *Welch v. Bowen*, 854 F.2d 436, 439 (11th Cir. 1988) (quoting *Sryock*, 764 F.2d at 836).  Such finding is then reviewable "only to determine whether it is supported by substantial evidence." *Sryock*, 764 F.2d at 836.

Here, the ALJ did make a specific finding that Plaintiff's nonexertional impairments were not severe enough to preclude a wide range of light work.  First, he explained that after having considered Plaintiff's diagnosis of borderline intellectual functioning, her dysthymia, the reports of her academic progress in school, and the non-examining state-agency consultants' findings that Plaintiff was moderately limited in the area of concentration, persistence, or pace due to mental impairment, he concluded that Plaintiff "must not perform work involving detailed or complex instructions."  [R38-39].  He then went on to explain that such work is equivalent to

40

"unskilled" work and that the availability of the work could therefore be determined via reference to the grids:

> If the claimant had the residual functional capacity to perform the full range of light work, considering the claimant's age, education, and work experience, a finding of "not disabled" would be directed by Medical-Vocational Rule 202.17.  However, the additional limitations have little or no effect on the occupational base of unskilled light work.  A finding of "not disabled" is therefore appropriate under the framework of this rule.  The claimant is capable of performing light level work and the full contingent of mental activities generally required by competitive, remunerative, unskilled work on a sustained basis.  The assessed limitation for only performing work not involving detailed or complex instructions is fully consistent with unskilled work, and does not significantly erode the occupational base for those jobs consisting of light or sedentary level unskilled work.  There are approximately 1,600 unskilled light and sedentary jobs in the occupational base (Social Security Ruling 83-14; 20 CFR Part 404, Subpart P, section 202.00).

[R39].  As the Commissioner points out, the Eleventh Circuit Court of Appeals has determined that where there is substantial evidence supporting a claimant's ability to perform unskilled work, an ALJ may make a determination of nondisability based on the grids notwithstanding a diagnosis of borderline intellectual functioning.  *See Jordan*, 470 Fed. Appx. at 770 (noting that "[a]lthough borderline intellectual functioning may, in conjunction with other conditions, contribute to a finding that an individual's impairments significantly limit her basic work skills, there is no merit to [the plaintiff's] suggestion that it mandates that conclusion" and affirming the ALJ's reliance on the grids to find non-disability).

41

The undersigned finds, however, that in the case presently before the Court, the ALJ's determination that Plaintiff's nonexertional impairments were not sufficiently severe to erode the occupational base for light work was not supported by substantial evidence and, therefore, that the ALJ erred by relying exclusively on the grids.

An individual can perform unskilled, competitive employment when she is able to, "on a sustained basis": understand, carry out, and remember simple instructions; respond appropriately to supervision, coworkers, and usual work situations; and deal with changes in a routine work setting. SSR 85-15. Here, however, the ALJ awarded weight to the determinations of the non-examining state agency psychological consultants, who found that Plaintiff could concentrate only for "brief" two-hour periods. [*See* R334, 381]. This nonexertional limitation would affect Plaintiff's ability to perform unskilled competitive employment as it is defined in SSR 85-15, in that even if Plaintiff is not significantly limited in her ability to understand, carry out, and remember simple instructions, respond appropriately to supervision, coworkers, and usual work situations, or deal with changes in a routine work setting, she may not be able to do so on a sustained basis. [*See* R332-34, 379-81]. Moreover, the fact that Plaintiff was unable to "catch on" to the duties attendant to a cashier position, [R33], appears to directly contradict the ALJ's assertion that Plaintiff's non-exertional limitations "have little to no effect on the occupational base of unskilled light work."

42

*See Dictionary of Occupational Titles*, Code 311.472-010 (classifying Cashier, Fast Foods Restaurant, as light, unskilled work); *see also Apone v. Astrue*, No. 108-CV-00219-MP-AK, 2010 WL 1381008, at *5 (N.D. Fla. Mar. 31, 2010) (recalling VE testimony referring to Cashier, Fast Foods Restaurant as light, unskilled work).

In order to determine that the ALJ's decision was supported by substantial evidence, it must be clear the that ALJ took into account evidence both favorable and unfavorable to his opinion. *See McCruter v. Bowen*, 791 F.2d 1544, 1548 (11th Cir. 1986) (holding that an administrative decision is not supported by "substantial evidence" where the ALJ acknowledges only the evidence favorable to the decision and disregards contrary evidence). Here, it is not clear that the ALJ considered that Plaintiff had already failed to maintain employment in a light, unskilled position, nor does it appear that the ALJ considered the consultants' opinions that Plaintiff could concentrate only for "brief" two-hour periods when he found that Plaintiff retained the functional capacity to perform unskilled work for the equivalent of an eight-hour day. *See Rye v. Comm'r of Soc. Sec. Admin.*, 270 Fed. Appx. 938, 939 (11th Cir. Mar. 26, 2008) (noting that RFC refers to a "person's maximum remaining ability 'to do sustained work activities in an ordinary work setting on a regular and

43

continuing basis,'" which "means eight hours a day, five days a week, of the equivalent

work schedule") (quoting SSR 96-8p).

Instead, the ALJ found that Plaintiff's diagnosis of borderline intellectual

functioning, her dysthymia, the reports of her academic progress in school, and the

non-examining state-agency consultants' findings that Plaintiff was moderately limited

in the area of concentration, persistence, or pace due to mental impairment precluded

Plaintiff from performing work involving detailed or complex instructions.  [R38-39].

Then, without considering the state consultants' findings that Plaintiff had the ability

to sustain concentration for only two hours at a time or considering Plaintiff's failed

attempt to work as a fast-food cashier, he found that Plaintiff's non-exertional

limitations had "little to no effect" on her capacity to perform the full range of light,

unskilled work, and he continued on to apply the vocational grids.  [*See* R39-40].  This

was error:  according to Eleventh Circuit precedent, the ALJ was bound to either

(1) make a specific determination—supported by substantial evidence—explaining that

he did not credit the additional evidence of non-exertional limitations, or (2) consult a

vocational expert to determine whether there were sufficient jobs in the national

economy that Plaintiff could perform during the relevant period in light of the

additional non-exertional limitations. *See Phillips*, 357 F.3d at 1244 (requiring the ALJ

to address evidence of restrictions suggesting limitations to the claimant's basic work

skills before relying on the grids); *Allen*, 880 F.2d at 1202 (requiring VE testimony where the ALJ credited evidence of medically documented psychological and emotional limitations indicating that the plaintiff was not capable of performing unlimited types of unskilled light work).

As a result, the undersigned **RECOMMENDS** to the District Judge that he **REVERSE** the opinion of the ALJ and **DIRECT** him to correct the error upon remand.

## VIII. Conclusion

In conclusion, the undersigned United States Magistrate Judge **RECOMMENDS** that the Commissioner's final decision denying benefits to Plaintiff be **AFFIRMED IN PART and REVERSED IN PART** and **REMANDED** to the Commissioner for further consideration of Plaintiff's claims, as recommended herein.

The Clerk is **DIRECTED** to terminate the reference to the undersigned.

**IT IS SO RECOMMENDED and DIRECTED**, this 27th day of December, 2013.

ALAN J. BAVERMAN
UNITED STATES MAGISTRATE JUDGE

AO 72A
(Rev.8/8
2)